**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

JANE DOE 1; JANE DOE 2; JANE DOE 3; JANE DOE 4; JANE DOE 5; JANE DOE 6; JANE DOE 7; JANE DOE 8; JANE DOE 9; JANE DOE 10; JANE DOE 11; JOHN DOE 1; JOHN DOE 2; JOHN DOE 3; JOHN DOE 3; JOHN DOE 4; JOHN DOE 5; and JOHN DOE 6,[1]

Plaintiffs,

v.

CENTRAL INTELLIGENCE AGENCY; and JOHN L. RATCLIFFE, in his official capacity as Director of the Central Intelligence Agency,

Defendants.

Case No. 1:26-cv-3461

## COMPLAINT

Plaintiffs, complaining of the Defendants, allege and say:

## SUMMARY

1. This action arises out of Title VII of the Civil Rights Act and associated claims that result from the illegal treatment of highly trained, highly specialized national security personnel whose careers have been sidelined and squandered because of a combined contortion of the Civil Rights Act itself and an illogical and myopic belief that employees who carried out functions vaguely described as involving Diversity, Equity, Inclusion, and Accessibility ("DEIA"), at the express

[1] The designation of Plaintiffs under a Jane Doe and John Doe heading is designed to both protect the identity of CIA employees and to comply with an Agency request to use such a moniker. Plaintiffs expressly conferred with the Agency before filing this action and although they have been effectively banished from their workplace, they remain steadfast, as do their counsel, to ensure that they guard against disclosing information that could harm national security.

direction of their employer, should be removed from all of their duties and placed under the constant threat of termination, because the policies they were directed by their own Agency to support were declared by President Trump to be illegal and discriminatory.

2. In an action directed by the head of the Agency itself, against internal opposition and all rationale logic, the Plaintiffs have, since January 22, 2025, been sent home with no duties or access to the Agency and remain under express threat of termination. This continuing hostile environment, illegal in and of itself under the Administrative Leave Act of 2016 that took official effect on January 16, 2025, has degraded not only the Plaintiffs job skills but also their integrity and well-being. They come to this Court after exhausting both their efforts to be reinstated, which the Agency has rebuffed, and their administrative claims seeking to be compensated for the harm to their employment and integrity that has resulted in not only loss of employment opportunities but in emotional distress and pain and suffering, caused by the intentional and myopic acts that the Agency has foisted in an effort to blame Plaintiffs for performing duties and assignments that were perfectly legal at the time they performed them.

3. The unlawful employment actions include the placement of Plaintiffs on indefinite administrative leave, denial of onward assignments and promotions to Plaintiffs, threatened termination of Plaintiffs' federal employment, and termination and/or constructive termination of Plaintiffs' federal employment, solely based on Plaintiffs' temporary broadening rotational assignments to positions involving, or perceived to be involving, DEIA initiatives at the Central Intelligence Agency (CIA).

4. The responsibility for these illegal actions lies solely with the Director of the CIA, John L. Ratcliffe, who determined that an Executive Order (EO) required him not just to end the policies of DEI and DEIA, but could also be used as justification to remove from the workplace and seek to fire those employees who were in some way assigned "DEIA-related" tasks.

5. Director Ratcliffe is believed to have overruled the CIA's senior management and EEO staff, which cautioned that the employees he was seeking to terminate were valuable Agency assets and were not actually "DEIA" personnel. Instead, they were highly trained national security generalists, who, as is standard for most Agency personnel, moved between duties, positions, and assignments. DEIA tasks were merely part of their current assignment.

6. Perhaps not coincidentally, all of the Plaintiffs in this action happen to be members of protected classes. Each has either been on enforced administrative leave or was forced into termination since January 22, 2025, *more than 630 days ago*. The 630+ days in this employment brig is clearly designed to force the Plaintiffs to quit, as a work environment that closes in on two years without any actual meaningful work is, by definition, hostile as it deprives the employee of any productive meaningful work at all.

7. Plaintiffs seek an end to this cruel charade that has blamed them for shifts on employment policies substantially above their paygrade. They neither design nor are responsible for policies defining what discrimination is, and to subject them to the whims of the party in power not only ignores their rights but undermines their ability and the ability of other Agency personnel from performing their primary duty of protecting the nation from national security threats.

## PARTIES

8. **Plaintiffs Jane Doe 1 through Jane Doe 11 and John Doe 1 through John Doe 6** (collectively, "Plaintiffs") are current or former federal employees of the CIA. At all times relevant to this Complaint, Plaintiffs were career civil servants who had been temporarily assigned to rotational and/or broadening positions working on DEIA initiatives, either in the CIA's Diversity and Inclusion Office (DIO), in other Agency components where DEIA-related work constituted, or were perceived to constitute, a substantial portion of their duties.

9. In the interests of national security, Plaintiffs proceed under the following pseudonyms to protect classified and sensitive employment information.[2]

a. JANE DOE 1 ([redacted])
b. JANE DOE 2 ([redacted])
c. JANE DOE 3 ([redacted])
d. JANE DOE 4 ([redacted])
e. JANE DOE 5 ([redacted])
f. JANE DOE 6 ([redacted])
g. JANE DOE 7 ([redacted])
h. JANE DOE 8 ([redacted])
i. JANE DOE 9 ([redacted])
j. JANE DOE 10 ([redacted])
k. JANE DOE 11 ([redacted])
l. JOHN DOE 1 ([redacted])
m. JOHN DOE 2 ([redacted])
n. JOHN DOE 3 ([redacted])
o. JOHN DOE 4 ([redacted])
p. JOHN DOE 5 ([redacted])

[2] Because of the positions held by the Plaintiffs within the Agency, the Agency imposes an internal requirement to seek a pre-publication review of any information that concerns them and their duties within the Agency. As of the date of this filing, although such a request has been made by each Plaintiff, the Agency has not completed its pre-publication review, which is preventing Plaintiffs from providing details that demonstrate each person's expertise and that the purpose for why they were hired is not related to DEIA whatsoever. Moreover, it prevents Plaintiffs from identifying their exceptional performance and accolades and other information that supports the action taken against them by the Agency was unwarranted and unlawful. Plaintiffs intend to file an amendment to this complaint following this internal Agency review process with the intent to identify this information and assert that any such amendment should not affect their right as a matter of course to amend their complaint pursuant to Fed. R. Civ. Proc. 15(a)(1).

q. JOHN DOE 6 ([redacted])

## DEFENDANTS

10. **Defendant Central Intelligence Agency** is an independent agency of the United States Government with its principal office located in Langley, Virginia. The CIA is an "agency" within the meaning of 5 U.S.C. § 701(b)(1).

11. **Defendant John L. Ratcliffe** is the Director of the CIA and is sued in his official capacity and is also the principal discriminatory and retaliatory actor in this Complaint. As Director, Mr. Ratcliffe is responsible for the management and operation of the CIA. Director Ratcliffe is believed to be the actual official who took the actions set forth in this Complaint against Plaintiffs. Director Ratcliffe's principal office is located in Langley, Virginia.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343(a)(4) (civil rights jurisdiction).

13. This Court has jurisdiction to grant declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; and the Mandamus Act, 28 U.S.C. § 1361; Constitutional claims under federal question jurisdiction, 28 U.S.C. § 1331, and to review agency action under the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*.

14. The permissive joinder of the Plaintiffs in this action is appropriate pursuant to Fed. R. Civ. Proc. Rule 20(a)(1) because the Plaintiffs have asserted rights to relief jointly, severally, or in the alternative, with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and, because questions of law or fact which will arise in this action are common to all Plaintiffs.

15. Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(e)(1) because: (a) Defendant CIA maintains its principal office in this judicial district; (b) a substantial part of the events giving rise to Plaintiffs' claims occurred in this district; and (c) Plaintiffs would have worked in this district but for the unlawful employment actions challenged herein.

# FACTS

**The History of DEIA in Federal Employment**

16. On August 18, 2011, President Barack Obama signed Executive Order ("EO") 135832011 "Establishing a Coordinated Government-Wide Initiative to Promote Diversity and Inclusion in the Federal Workforce,"[3] Section 1 of that Order declared, in pertinent part:

> *Policy.* Our Nation derives strength from the diversity of its population and from its commitment to equal opportunity for all. We are at our best when we draw on the talents of all parts of our society, and our greatest accomplishments are achieved when diverse perspectives are brought to bear to overcome our greatest challenges.
>
> A commitment to equal opportunity, diversity, and inclusion is critical for the Federal Government as an employer. By law, the Federal Government's recruitment policies should "endeavor to achieve a work force from all segments of society." (5 U.S.C. 2301(b)(1)).[4] As the Nation's largest employer, the Federal Government has a special obligation to lead by example. Attaining a diverse, qualified workforce is one of the cornerstones of the merit-based civil service.

[3] Whether Executive Orders have the force of law or are merely aspirational statements of the Executive Branch is a subject of much debate. Many legal scholars have assailed the use of Executive Orders as violative of the Separation of Powers, as they are in essence Presidential legislation. *See*, "*The Use and Abuse of Executive Orders and other Presidential Directives*" Gaziano, Todd., The Heritage Foundation (February 21, 2021; "*Executive Orders Pose Risks to Liberty and Governance*" Norwatech. Alex. Cato Institute (October 10, 2024*). "President or King? The Use and Abuse of Executive Orders in Modern-Day America,"* Braum, Tara, Notre Dame, Journal of Legislation Vol. 28, issue 1, (2002) Whether the Orders at issue here as applied violate Plaintiffs Constitutional Rights are discussed, *infra*.

[4] 5 U.S.C. §2301(b) contains the Merit System Principles, which guide the manner in which all federal employees are to be treated and assessed. Notably, subsection (b)(2) states:
All employees and applicants for employment should receive fair and equitable treatment in all aspects of personnel management without regard to political affiliation, race, color, religion, national origin, sex, marital status, age, or handicapping condition, and with proper regard for their privacy and constitutional rights.

17. Diversity and Inclusion were not specifically defined, but any fair reading of the Order by its very terms, textually included diversity and inclusion as a function of equal employment opportunity (EEO).

18. On January 20, 2021, President Joe Biden issued Executive Order 13985 (Advancing Racial Equity and Support for Underserved Communities Through the Federal Government), which established that affirmatively advancing equity, civil rights, racial justice, and equal opportunity is the responsibility of the whole of our government and directed federal agencies to assess and address systemic barriers and racial inequities in their policies and programs.

19. Then, on June 25, 2021, President Biden issued EO 14035. That Order related specifically to "Diversity, Equity, Inclusion, and Accessibility in the Federal Workforce." President Biden stated that the Order was premised on the requirement that:

> Section 1: *Policy*: As the Nation's largest employer, the Federal Government must be a model for diversity, equity, inclusion, and accessibility, where all employees are treated with dignity and respect. Accordingly, the Federal Government must strengthen its ability to recruit, hire, develop, promote, and retain our Nation's talent and remove barriers to equal opportunity. It must also provide resources and opportunities to strengthen and advance diversity, equity, inclusion, and accessibility across the Federal Government.
>
> The Federal Government should have a workforce that reflects the diversity of the American people. A growing body of evidence demonstrates that diverse, equitable, inclusive, and accessible workplaces yield higher-performing organizations. Federal merit system principles include that the Federal Government's recruitment policies should ''endeavor to achieve a work force from all segments of society'' and that ''[a]ill employees and applicants for employment should receive fair and equitable treatment in all aspects of personnel management'' (5 U.S.C. 2301(b)(1), (2)). As set forth in Executive Order 13583 of August 18, 2011 (Establishing a Coordinated Government-Wide Initiative to Promote Diversity and Inclusion in the Federal Workforce), the Presidential Memorandum of October 5, 2016 (Promoting Diversity and Inclusion in the National Security Workforce), Executive Order 13988 of January 20, 2021 (Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation), the National Security Memorandum of February 4, 2021 (Revitalizing America's Foreign Policy and National Security Workforce, Institutions, and Partnerships), and Executive Order 14020 of March 8, 2021 (Establishment of the White House Gender Policy Council), the Federal Government is at its best when drawing upon all parts of society, our greatest accomplishments are achieved when diverse perspectives are brought to

bear to overcome our greatest challenges, and all persons should receive equal treatment under the law.” (citations omitted).

20. The Order also included definitions:

> Sec. 2. Definitions. For purposes of this order, in the context of the Federal workforce:
>
> (a) The term ‘‘underserved communities’ refers to populations sharing a particular characteristic, as well as geographic communities, who have been systematically denied a full opportunity to participate in aspects of economic, social, and civic life. In the context of the Federal workforce, this term includes individuals who belong to communities of color, such as Black and African American, Hispanic and Latino, Native American, Alaska Native and Indigenous, Asian American, Native Hawaiian and Pacific Islander, Middle Eastern, and North African persons. It also includes individuals who belong to communities that face discrimination based on sex, sexual orientation, and gender identity (including lesbian, gay, bisexual, transgender, queer, gender non-conforming, and non-binary (LGBTQ+) persons); persons who face discrimination based on pregnancy or pregnancy related conditions; parents; and caregivers. It also includes individuals who belong to communities that face discrimination based on their religion or disability; first-generation professionals or first-generation college students; individuals with limited English proficiency; immigrants; individuals who belong to communities that may face employment barriers based on older age or former incarceration; persons who live in rural areas; veterans and military spouses; and persons otherwise adversely affected by persistent poverty, discrimination, or inequality. Individuals may belong to more than one underserved community and face intersecting barriers.
>
> (b) The term ‘‘diversity’’ means the practice of including the many communities, identities, races, ethnicities, backgrounds, abilities, cultures, and beliefs of the American people, including underserved communities.
>
> (c) The term ‘‘equity’’ means the consistent and systematic fair, just, and impartial treatment of all individuals, including individuals who belong to underserved communities that have been denied such treatment.
>
> (d) The term ‘‘inclusion’’ means the recognition, appreciation, and use of the talents and skills of employees of all backgrounds.
>
> (e) The term ‘‘accessibility’’ means the design, construction, development, and maintenance of facilities, information and communication technology, programs, and services so that all people, including people with disabilities, can fully and independently use them. Accessibility includes the provision of accommodations and modifications to ensure equal access to employment and participation in activities for people with disabilities, the reduction or elimination of physical and attitudinal barriers to equitable opportunities, a commitment to ensuring that people with disabilities can independently access every outward-facing and internal activity or electronic space, and the pursuit of best practices such as universal design.

21. Notably, Section 10 of the EO made it clear that the Order was specifically designed in enhancing the opportunities for people with disabilities.

22. Section 12 noted the need to advance Equity in employment considerations for the LGBTQ+[5] communities.

23. President Biden directed that all federal agencies focus on promoting DEIA in the federal workforce as part of the commitment of the Federal Government to promote EEO and serve as a "model employer."[6]

24. On July 22, 2022, the Office of Personnel Management issued that policy, and stated, in pertinent part that:

> As the Nation's largest employer, the Federal Government should be a model for Diversity, Equity, Inclusion, and Accessibility (DEIA), where all employees are treated with dignity and respect. We are at our best when drawing upon all parts of society, and our greatest accomplishments are achieved when diverse perspectives are brought to bear to overcome our greatest challenges.

OPM directed agencies to conduct the following actions:

> * Convening an executive level diversity officer council to provide agency chief diversity officers and senior leaders a formal forum to exchange ideas, best practices, and challenges in implementing and assessing progress of the DEIA mission and vision.
> * Adopting practices to serve all dimensions of diversity in the Federal workforce, including engagement with employee resource groups and Federal unions, increased utilization of promotion and retention strategies, promotion of internship and mentorship programs, and expansion of partnerships with Minority Serving Institutions (MSIs).
> * Utilizing current hiring authorities to encourage employment of veterans, military spouses, individuals with disabilities, and early career talent, among others. These hiring authorities are designed to give agencies flexibility to quickly hire top talent for critical positions and remove barriers to employment.

---

[5] The term stands for Lesbian, Gay, Bisexual, Transgender, Queer and other sexual orientations and/or gender expressions that diverge from heterosexual or cisgender identification.

[6] This language tracks the directive the EEOC set out for discrimination cases generally and is also used by the Federal Government in enforcing the Uniform Services Employment and Reemployment Rights Act. *See* 29 C.F.R. 1613.701; 38 U.S.C. § 4301(b). Thus, the idea that the government act as a model employer is a direct reference to its obligation to broadly apply laws that strike at discriminatory and retaliatory conduct, and that undermine the promise of a workplace free from these noxious and illegal practices.

> * Increasing the number of internships, especially paid internships across the Federal government.

Source: Fact Sheet Building a Better Workforce for the American People.

25. In addition to the above, the Equal Employment Opportunity Commission (EEOC) required under 29 C.F.R. 1614.101, et seq. that:

> General policy.
>
> (a) It is the policy of the Government of the United States to provide equal opportunity in employment for all persons, to prohibit discrimination in employment because of race; color; religion; sex; national origin; age; disability; genetic information; or pregnancy, childbirth, or related medical conditions; and to promote the full realization of equal employment opportunity through a continuing affirmative program in each agency.
>
> (b) No person shall be subject to retaliation for opposing any practice made unlawful by title VII of the Civil Rights Act (title VII) (42 U.S.C. 2000e *et seq.*), the Age Discrimination in Employment Act (ADEA) (29 U.S.C. 621 *et seq.*), the Equal Pay Act (29 U.S.C. 206(d)), the Rehabilitation Act (29 U.S.C. 791 *et seq.*), the Genetic Information Nondiscrimination Act (GINA) (42 U.S.C. 2000ff *et seq.*), or the Pregnant Workers Fairness Act (PWFA) (42 U.S.C. 2000gg *et seq.*) or for participating in any stage of administrative or judicial proceedings under those statutes.

**<u>The Trump Administration Reverses DEI and DEIA Policy Declaring it a Form of Discrimination</u>**

26. On January 20, 2025, President Trump issued Executive Order 14151, “Ending Radical and Wasteful Government DEI Programs and Preferencing.” The Executive Order directed federal agencies to terminate DEIA offices and positions, characterizing such programs as “illegal and immoral discrimination.”

27. The Executive Order stated in part that: “The Biden Administration forced illegal and immoral discrimination programs, going by the name "diversity, equity, and inclusion" (DEI), into virtually all aspects of the Federal Government…”. Thus, by its very terms the incoming Administration equated DEI with illegal conduct and active discrimination.

28. The Executive Order required:

> The Director of the Office of Management and Budget (OMB), assisted by the Attorney General and the Director of the Office of Personnel Management (OPM)," to "coordinate the termination of all discriminatory programs, including illegal DEI and "diversity, equity, inclusion, and accessibility" (DEIA) mandates, policies, programs, preferences, and activities in the Federal Government, under whatever name they appear. EO 14151 Section 2 (a).

29. The Executive Order further required each agency, department, or commission head to:

> terminate, to the maximum extent allowed by law, all DEI, DEIA, and "environmental justice" offices and positions (including but not limited to "Chief Diversity Officer" positions); all "equity action plans," "equity" actions, initiatives, or programs, "equity-related" grants or contracts; and all DEI or DEIA performance requirements for employees, contractors, or grantees. Section 2(b)(1).

30. Nothing in the Executive Order required the termination of any particular employee or to separate them from the federal service and by its terms, the Executive Order seemed to limit the required action to the elimination of specific DEI and DEIA offices, positions, and functions.

31. By its explicit terms the President decreed that, "This order shall be implemented consistent with applicable law and subject to the availability of appropriations." EO Section 4(b).

32. Conspicuously, the Executive Order failed to even define what DEI or DEIA was or how an office or position was determined to be a DEIA or DEIA office or position. With exception of a reference to "Chief Diversity Officer," the President's Executive Order, cited no criteria or methodology for determining the extent to which a position or office was a DEI or DEIA office or position.

33. Two days later, President Trump issued a second Executive Order. This Executive Order, EO 14173, targeted federal contractors and the private sector. Although that Order was not limited to the federal government, it did emphasize the position that the Administration viewed

DEI and DEIA programs as themselves a form of illegal discrimination. Section 1 of the EO stated:

> Longstanding Federal civil-rights laws protect individual Americans from discrimination based on race, color, religion, sex, or national origin. These civil-rights protections serve as a bedrock supporting equality of opportunity for all Americans. As President, I have a solemn duty to ensure that these laws are enforced for the benefit of all Americans.
> Yet today, roughly 60 years after the passage of the Civil Rights Act of 1964, critical and influential institutions of American society, including the Federal Government, major corporations, financial institutions, the medical industry, large commercial airlines, law enforcement agencies, and institutions of higher education have adopted and actively use dangerous, demeaning, and immoral race- and sex-based preferences under the guise of so-called "diversity, equity, and inclusion" (DEI) or "diversity, equity, inclusion, and accessibility" (DEIA) that can violate the civil-rights laws of this Nation.
>
> Illegal DEI and DEIA policies not only violate the text and spirit of our longstanding Federal civil-rights laws, they also undermine our national unity, as they deny, discredit, and undermine the traditional American values of hard work, excellence, and individual achievement in favor of an unlawful, corrosive, and pernicious identity-based spoils system. Hardworking Americans who deserve a shot at the American Dream should not be stigmatized, demeaned, or shut out of opportunities because of their race or sex.
>
> These illegal DEI and DEIA policies also threaten the safety of American men, women, and children across the Nation by diminishing the importance of individual merit, aptitude, hard work, and determination when selecting people for jobs and services in key sectors of American society, including all levels of government, and the medical, aviation, and law-enforcement communities. Yet in case after tragic case, the American people have witnessed first-hand the disastrous consequences of illegal, pernicious discrimination that has prioritized how people were born instead of what they were capable of doing.
>
> The Federal Government is charged with enforcing our civil-rights laws. The purpose of this order is to ensure that it does so by ending illegal preferences and discrimination.

34. As with the prior day's order, EO 14173 stated at Section 8(b): "This order shall be implemented consistent with applicable law and subject to the availability of appropriations."

35. It should be noted that the EEOC itself redefined DEI and DEIA as acts of illegal discrimination, thus there can be no issue as to whether adverse actions based on connection to DEI or DEIA sounds in a Civil Rights complaint.

36. In March 2025 the EEOC issued guidance that promoting DEI was a violation of EEO law. Thus, the EEO perversely established that DEI and DEIA claims sound in Title VII and the Rehabilitation Act of 1973.[7] "*What You Should Know about DEI-Related Discrimination at Work"* Technical Guidance, March 19, 2025. *See also* subsequent statement of EEOC in "*EEOC Delivers on Administrations Priorities and President Trump's Executive Orders,*" May 7, 2026 News Release.

37. The EEOC's technical guidance document on DEI discrimination continues the failure to define what DEI is and omits a reference to Accessibility. In tautological fashion it claims:

> Unlawful limiting, segregating, or classifying workers related to DEI can arise when employers separate workers into groups based on race, sex, or another protected characteristic when administering DEI or any trainings, workplace programming, or other privileges of employment, even if the separate groups receive the same programming content or amount of employer resources.

38. The lack of concrete language to define what a DEI (or DEIA) program or policy is, or how that is distinguishable from EEO, is perhaps intentional. Lack of clarity gives the policy a flexible meaning that can be used to attack policies that advance civil rights under the guise that these policies actually are violations.[8]

---

[7] There is substantial confusion as to how the Trump Administration's policies impact disability as a status. DEI and DEIA appear to be used interchangeably. It is uncertain how the CIA or other agencies view DEI and DEIA policies as it related to the requirements under the Rehabilitation Act to prevent discrimination based on actual and perceived disability.

[8] As George Orwell noted, "When the general atmosphere is bad, language must suffer. . . . The great enemy of clear language is insincerity. When there is a gap between one's real and one's declared aims, one turns as it were instinctively to long words and exhausted idioms, like a cuttlefish spurting out ink." George Orwell *"Politics and the English Language"* Essay, Penguin Books, 1946.

**The CIA Interprets the Executive Orders as a Directive to Identify Employees Associated with DEIA or DEIA and Remove Them**

39. The two Executive Orders focused not on defining the substance of DEI or DEIA but in associating the words themselves as evidence of immorality and illegality.

40. On January 22, 2025, one day before Director Ratcliffe was sworn in on January 23, 2025, Mr. Ratcliffe, interpreting these orders as requiring the removal of employees associated with some aspect of DEI or DEIA in their employment, he placed all Plaintiffs on involuntary paid administrative leave, immediately removing them from their positions, prohibiting onward assignments, and barring them from CIA facilities without escorts.

41. Since that date the Plaintiffs have been given no duties, are not connected with the Agency in any meaningful way and have been stripped of all indicia of their employment.

42. On February 18, 2025, Director Ratcliffe issued a memorandum titled "Decision to Terminate the Employment of Employees in the Former Diversity and Inclusion Office," invoking Section 104A(e)(1) of the National Security Act of 1947 to terminate Plaintiffs' employment or, in the alternative, permit their resignation or retirement. Prior to the issuance of that memorandum, the Agency had consistently characterized its decision as being related to a reduction in force (RIF).

43. Director Ratcliffe has yet to actually terminate the Plaintiffs, no doubt due to litigation testing his authority to fire employees without following agency regulations or due process of law. *See John Doe 1, et al. v. Office of the Director of National Intelligence, et al.* (E.D. Va. Case No. 1:25-cv-00300-AJT-LRV). Yet, neither he nor the Agency has wavered on the desire to terminate the Plaintiffs.

44. Requests by the Plaintiffs to return to active employment, to be eligible for new assignments and advancements, and to serve the nation by defending national security at the CIA have been ignored or rebuffed.

45. At tremendous expense to the taxpayer, approximately $4,000,000.00 to date, the Plaintiffs remain on the public payroll but are denied meaningful employment. As time passes, their skills and advancement opportunities wane.

46. The denial of any access to the workplace for illogical reasons based on opaque concepts that participation, or perceived participation, in DEI or DEIA functions is a proper causal agent for administrative leave and termination, creates a severe, pervasive, and ongoing hostile work environment.

47. The Plaintiffs have been subject to a constructive discharge and a hostile work environment based on their participation in, or the perception of their participation in, protected EEO activity. Immediately prior to the start of the administrative leave, the Agency openly stigmatized Plaintiffs in communication to the Agency workforce by transmitting messaging condemning DEIA activities and directing the Agency workforce to report any DEIA-related activities to the Inspector General. Those Plaintiffs who were assigned to the Diversity and Inclusion Office (DIO) proper were directed by Agency leadership to destroy all of their DEIA-related work products. While on administrative leave, all Plaintiffs received a copy of an internally distributed, unclassified documented titled, "FAQS: Agency's Implementation of Executive Orders, Presidential Memorandums, and OPM Guidance," (either in the mail, personal/low-side email, or at in-person meetings requested by the Agency) that again announced the complete removal of DEIA content, announced the closure of employee resource groups, and further announced that any activities supporting DEIA should be referred to the Inspector General. Notably, none of the official messaging to the workforce has ever acknowledged that any CIA officers had been placed on administrative leave.

48. Each day they are threatened with termination and remain on administrative leave is also an act of retaliation and reprisal for protected activity.

49. On February 12, 2025, the first Plaintiff, John Doe 4, contacted the Agency's EEO Office to lodge a complaint of discrimination based on his placement on administrative leave and threatened termination. The last such initial contact occurred on February 19, 2025.

50. Each of the Plaintiffs lodged a formal complaint of discrimination, the last of which occurred on May 9, 2025.

51. Each of the Plaintiffs is a member of a protected class, and each Plaintiff has included claims that they have been subject to discrimination, retaliation, and reprisal based on their being in a protected class. They have alleged an ongoing hostile work environment, and each asserts a constructive discharge claim.

52. As they must rely on the Agency clearance procedures to seek positions outside the Agency, the employees are in a double bind; they may not perform any duties for the CIA and, unless they resign, they are limited in securing alternative employment that utilizes their skillsets related to their CIA employment or conflicts with being still considered a full-time federal employee.

53. While contending that the Plaintiffs are not entitled to any indicia of their employment, other than being on paid leave, the CIA has simultaneously argued that their mistreatment is largely classified in nature and insists on subjecting them to strenuous security protocols that have enhanced the cost and expense associated with their pursuing of legal remedies.

54. In the end, the decision to place the employees beyond the pale of meaningful employment is based on a masterclass in defective logic and misplaced responsibility. If, as President Trump was saying, diversity, equity, inclusion, and accessibility concepts and polices were illegal, discriminatory, immoral, and violative of the Civil Rights laws themselves, then the

culprit behind those policies was not the employees, but the Agency that directed the employees to carry them out.

55. As a matter of law, the action is illegal *per se.* A principal who now redefines previous legal and laudatory conduct as illegal and immoral, cannot post hoc justify an adverse action and termination based on a claim that the employee was or is responsible for carrying out acts that were previously legal on the grounds they are now illegal.

56. To do so would create havoc and uncertainty among all employees and is quintessentially arbitrary and capricious.

57. Such punitive action would and may have already undermined the rights and morale of all employees at the CIA.

58. National security personnel operate in the shadows, often under assumed names and at substantial personal risk to their well-being.

59. They must often react under intense pressure, making decisions and carrying out policies that may be controversial at the time they occur or at some later time.

60. To institute employment actions that are punitive to the employee based on shifts in political philosophy would create a system where the employee must guess at how an action will be perceived at a later date.

61. It would undermine the integrity of the entire manager-employee system, as a subordinate would have no legal protection for carrying out directives given to them that were legal at the time they were carried out.

62. To allow an employer to claim that they were merely "reorganizing" to comply with a new Administration's priorities would leave all employees at the mercy of those shifting priorities.

63. It also undermines good order and discipline in the workforce itself. A federal employee who is directed to perform an otherwise legal assignment may not reject performing those duties simply because they disagree with the policy itself. Doing so would be insubordinate and disruptive to the employer-employee relationship and would leave the employee guessing as to whether a task that was performed today would be ruled illegal tomorrow.

64. In reality, the Administration and the CIA Director equated performance of a "DEI or DEIA policy or function" with support for the philosophy of DEI or DEIA.

65. The actions taken against the Plaintiffs are therefore predicated on a perception of their personal political philosophies and not any legitimate employer interest.

**The Nature of Plaintiffs DEI and DEIA Assignments as a Collateral Duty**

66. Up until January 20, 2025, the Plaintiffs had received tasking from the Agency to assist in carrying out a mission that was specifically designed to enforce and enhance EEO.

67. DEIA assignments, although not an essential function of the Plaintiffs' positions and although they were not exclusively assigned to such tasks, were part and parcel of an Agency-directed policy. Prior to January 20, 2025, the Agency had even required that all Agency officers have DEIA-related objectives within their Key Job Expectations and questions regarding inclusive efforts were part of senior-level promotion criteria. The removal of DEI- related work from Agency performance goals or consideration for performance evaluations was noted in the unclassified FAQs sent to the Agency workforce regarding the implementation of Executive Orders, Presidential Memorandums, and OPM Guidance

68. Thus, to the extent the Agency argues that it must remove the Plaintiffs from their place of employment or terminate them from their positions because they engaged in illegal or

immoral conduct, or because their work violated an Executive Order, the Agency is contending that the CIA itself was, up until January 20, 2025, involved in illegal and immoral conduct on an Agency-wide basis.

69. As such, the actual or constructive termination of the Plaintiffs cannot be legitimate in the first instance, because regardless of the causes of action and facts set forth below, the misconduct here was directed to the employees by the Agency itself. As the claimed actions by the Agency are inapposite with the Executive Orders, the responsibility for any violations of law rests solely with the Agency itself.

70. An action that is illegal *ab initio* cannot form the basis of legitimate conduct.

71. What is clear is that prior to January 20, 2025, the Plaintiffs were carrying out functions that the Agency stated supported EEO and Civil Rights initiatives.

72. Previous administrations had seen DEIA as an expression of expanding opportunity for marginalized groups on the basis of race, sex, disability, national origin and sexual orientation. The Agency itself established the most recent version of the Diversity and Inclusion Office in 1999 to address prior administrations' interest in the topic, although there is evidence of Agency interest in diversity and inclusion issues as far back as 1953 (The Petticoat Panel).

73. In a complete reversal, President Trump's2025 Executive Orders saw DEIA as itself a form of discrimination.

74. Each of the Plaintiffs is a career federal employee of the CIA who had been recruited, hired, trained, and educated for specific Agency duties unrelated to DEIA work.

75. The Plaintiffs each possess high level security clearances that were based on extensive background checks.

76. The Plaintiffs perform sensitive national security-based assignments.

77. The Agency itself has stated, even in response to the filing of this complaint, that the Plaintiffs are valuable national security assets, whose identity and assignments must be protected from public disclosure, less their potential safety and connection to classified information and duties be compromised.

78. In fact, Plaintiffs possess critical mission skills, training, knowledge, and a collective total of over **247** years of Agency experience in areas such as finance, human resources, security, intelligence analysis, data science, cyber development, telecommunications, project management, cartography, and technical operations. Many occupations currently open for application on the Agency's own website are seeking these skillsets, and in fact, every single one of these aforementioned occupations is open for application as of October 2026.

79. Plaintiffs are not, as Defendants believe or have claimed, "DEIA Officers." Rather, Plaintiffs are nonpartisan civil servants, in whom the Agency has invested considerable training and education, serving in vital national security career fields within the CIA, who the Agency itself directed to perform temporary "rotational" or "broadening" assignments to positions Defendants have deemed "DEIA positions."

80. Under the Agency's regulations and practices, Plaintiffs serve in numerous different roles within the Agency as part of their career progression, and the Agency may assign Plaintiffs to new roles in response to the specific needs of the Agency.

81. The acceptance of Plaintiffs' rotational or broadening assignments involving DEIA work was until recently, considered part of the Plaintiffs' career development and advancement track.

82. These assignments were consistent with the CIA's 2024-2027 own DEIA Strategy and aligned with federal civil rights laws, including Title VII of the Civil Rights Act of 1964 and the Rehabilitation Act of 1973.

83. Prior to January 20, 2025, the Agency's DEIA Strategy was a formal, Agency-approved initiative with stated objectives including: (a) equitable DEIA structures and resources; (b) workforce investment; (c) equitable and inclusive processes and procedures; (d) accountability; and (e) continued Agency education and development.

84. Plaintiffs' DEIA-related responsibilities included supporting recruitment and hiring, managing Agency Resource Groups, developing policies and procedures, reviewing budgets, planning educational events, and advancing implementation of federal EEO requirements, all with the specific Agency and federal government directed goals of drawing and maintaining as diverse a range of employees as possible.

85. Regardless of one's personal philosophy, recruiting, retaining and advancing persons of different racial and ethnic backgrounds strengthens national security and the Agency mission.

86. The retention of women also advances such interests.

87. Indeed, within the national security mission, real world concerns require people of diverse backgrounds to be employed and deployed.

88. For example, a conflict involving a nation in, say the Middle East, would logically lead to the Agency recruiting, retaining, and promoting people who have the language and cultural skills to operate in, or understanding the cultures of, the Middle East.

89. Far from being some "woke social experiment," diversity and inclusion advance the Agency's basic mission.

90. Similarly, equity, which is treating all federal employees similarly based on skills and not race, age, sex, national origin, sexual orientation or identity, advances even the Administration's claimed objectives of judging employees by the content and quality of their skills and character and not by their subjective identity.

91. Accessibility, as used in the workplace, generally applies to people with physical or mental disabilities. The goal under federal law is to ensure that highly qualified people whose physical or mental disabilities limit their life activities, but who are otherwise perfectly capable of performing the essential functions of their positions, are allowed to do so.

92. The actual application of DEI or DEIA then, is consistent with the objectives of the Civil Rights laws.

93. Plaintiffs also understood their work to be in furtherance of longstanding federal civil rights laws and Agency obligations to provide EEO free from discrimination based on race, color, religion, sex, national origin, age, and/or disability.

**The National Security Act and Agency Employment Regulations Support Diversity Considerations**

94. The National Security Act as amended on December 23, 2004, states that the Director of National Intelligence serves as the head of the intelligence community and is statutorily responsible, in relevant part, for ensuring "that the personnel of the intelligence community are sufficiently diverse for purposes of the collection and analysis of intelligence through the recruitment and training of women, minorities, and individuals with diverse ethnic, cultural, and linguistic backgrounds." 50 U.S.C. §3024(3)(A)(4).

95. Although the CIA Director has broad discretion under the National Security Act, 50 U.S.C. §401, to terminate employees when "the Director deems the termination . . .necessary or advisable in the interests of the United States[,]" 50 U.S.C. §§3036(e)(1), 3024(l)(1), the Agency must comply with its regulations when effecting such terminations.

96. CIA procedures for such terminations are set forth in Agency Regulation 4-16 (Termination Regulation). While the Termination Regulation reiterates the broad discretion

Congress conferred upon the Director to terminate Agency employees, it sets forth specific termination procedures that the Agencies must follow.

97. In pertinent part, the Agency must afford employees an opportunity to seek reassignment within their Agency rather than face termination. Specifically, when an employee is selected for termination because of "excess personnel functions or needs," an Agency representative must meet with the employee to discuss possible alternative positions within the Agency and, if the employee expresses interest in reassignment, Agency staff must assist the employee. *See* Termination Reg. §§ II(B)(9), II(C)(4)(c).

98. Additionally, the Termination Regulation provides a procedure for Agency employees facing termination to appeal internally. *See* Termination Reg. §§ II(E)(1)-(2).

**The Placement of Plaintiffs on Administrative Leave and Stated Threat to Terminate their Employment.**

99. Plaintiffs were tenured intelligence officers, etc., who, as described further below, all had served this country with utmost dedication and distinction.

100. Plaintiffs were tasked by the Agency with protecting the civil rights of its employees and instead have now fallen victim for doing what they were told to protect. Plaintiffs seek declaratory and injunctive relief to remedy violations of Title VII of the Civil Rights Act of 1964, the Rehabilitation Act, Age Discrimination in Employment Act (ADEA), and the Administrative Procedure Act.

101. The alleged basis for the Agency's actions relies upon two Executive Orders issues by President Trump.

102. Director Ratcliffe's decision to terminate Plaintiffs was arbitrary, capricious, contrary to law, and in excess of statutory authority. The CIA ignored alternative courses of action,

including reassignment to Plaintiffs' home career services, despite having available, identified onward positions for each Plaintiff and this being a requirement in Agency regulation.

103. Defendants' actions constitute unlawful employment discrimination and retaliation in violation of Title VII, the ADEA, and the Rehabilitation Act, as Plaintiffs were subjected to adverse employment actions due to retaliation for opposing discriminatory practices in their roles, as well as discrimination based on their race, color, sex, age, and/or disability.

104. The actions taken against Plaintiffs are economically wasteful and a threat to the integrity of the national security structure.

105. Plaintiffs committed no misconduct of any kind.

106. Plaintiffs were cited for no performance deficiencies.

107. Plaintiffs were not subject to any disciplinary process.

108. Plaintiffs were accorded no notice of any infractions.

109. Plaintiffs, other than through this suit, have not been given any way to challenge their being identified by the Agency as DEI or DEIA employees.

**Plaintiffs have Exhausted their Administrative Rights and Exhaustion is Futile**

110. Within forty-five (45) days of an alleged discriminatory or retaliatory act, an employee must contact an EEO Counselor at the Agency. *See* 29 C.F.R. § 1614.105.

111. Plaintiffs timely contacted an EEO Counselor to initiate their complaints.

112. On or about May 8, 2026, the Agency notified Plaintiffs, through counsel, that the investigations into their EEO Complaints had been completed and cited to Plaintiffs' rights under 29 C.F.R. Part 1614.

113. Plaintiffs requested a Final Agency Decision (FAD) pursuant to 29 C.F.R. 1614.110.

114. The Agency issued its FADs based on the written record and numerous Plaintiffs received decisions, the earliest of which was on July 20, 2026.

115. Within ninety (90) days of receipt of notice of a FAD, Plaintiffs may file a civil action. *See* 42 U.S.C. § 2000e-16(c).

116. The Agency has unequivocally and unilaterally declared an unalterable position in its decision to place Plaintiffs on administrative leave, deny onward assignments, and otherwise terminate Plaintiffs' employment. Defendants made these decisions in disregard of the National Security Act and the CIA's Termination Regulation, as well as the Administrative Leave Act and other applicable laws and regulations. Moreover, this Presidential administration and Defendants have rendered the EEO process a farce. The actions of Defendants and the administration in which they serve have, thus, rendered the EEO process futile, and Plaintiffs may bring suit. *See* 42 U.S.C. § 2000e-16.

**<u>CIA's Decision to Place Plaintiffs on Administrative Leave</u>**

117. On January 21, 2025, Plaintiffs and their DIO colleagues learned that the President had signed Executive Order 14151 and that DIO's budget was being eliminated.

118. On the morning of January 22, 2025, DIO and DIO-affiliated officers, including those Plaintiffs who were present in the DIO office, asked DIO management whether DIO was being shut down and were told, "No final decisions had yet been made."

119. Later that morning, on January 22, 2025, at approximately 11:00 a.m., DIO officers were instructed to take down all DIO poster boards across CIA Headquarters and to start dissembling the DIO physical office(s) immediately, including by disposal of all DEIA-related materials.

120. At approximately 2:15 p.m. EST on January 22, 2025, the DIO Director held a meeting and officially notified DIO-assigned officers that DIO was being disbanded and that all DIO-assigned staff officers were being involuntarily placed on paid administrative leave effective at 5:00 p.m. EST. Those Plaintiffs who were out of the office, and/or who worked for non-DIO entities, received notification of their status in other fashion, including being contacted by their management well after hours by their respective management(s) by telephone (and in those instances, these Plaintiffs were only allowed back into Agency spaces over a month later (or more) and under escort despite their TS/SCI clearance(s), solely to collect personal belongings). Around 5:00 p.m., those officers still online inside the Agency may also have received an Agency-wide email informing them that the Agency was stopping all DEIA activities. However, from first notice that the EO was going to affect activities, until administrative leave started at 5:00 p.m. on January 22, 2025, none of the Plaintiffs received anything official in writing about the Agency actions or the officers' respective work status.

121. At approximately 6:14 p.m. EST on January 22, 2025, the Associate Director for Talent sent an email to Plaintiffs and other affected employees stating: "This email provides important information regarding your employment status. Effective January 22, 2025, at 5:00 pm EST, all employees within the Diversity and Inclusion Office will be placed on administrative leave with full pay and benefits. This administrative leave is not being done for any disciplinary purpose." No officer that was placed on administrative leave saw this email, as they had been told to vacate Agency facilities at 5:00 p.m. EST, prior to the email being sent.

122. The email further informed Plaintiffs: "You are not required or expected to perform any work-related tasks during this period of administrative leave. You are not required or expected to

come to the office during this time." Again, notably, no officer that was placed on administrative leave saw the aforementioned email, as they had either been told to vacate Agency facilities at 5:00 p.m. EST, prior to the email being sent,. Others, especially those in non-DIO entities, were first notified of the leave via telephone well later that evening, at which point, their management read the email to them verbatim and were unable to answer any additional questions.

123. Director Ratcliffe, in consultation with the Chief Operating Officer and the Associate Director for Talent, made the decision to place Plaintiffs on administrative leave.

124. According to Agency officials, the decision was made to ensure the CIA complied with the President's Executive Order and to avoid any perception that the CIA was "hiding" DEI-related initiatives or programs. For that reason, Plaintiffs affected by this decision include individuals who were assigned to DIO-proper, were assigned to positions that were aligned to DIO, or, in some instances, seemingly regardless of actual job duties, were assigned to positions that merely had "diversity" as part of a broader office title. Further, decisions regarding who was placed on administrative leave appear to have been made solely based upon office assignment regardless of how long officers had been in their roles. –

125. At the time Plaintiffs were placed on administrative leave on January 22, 2025, the CIA had either already identified potential onward assignments for the Plaintiffs in their home career services, or their respective career services were able to identify potential onward assignments shortly thereafter. In some cases, multiple potential onward assignment options were identified for Plaintiffs. Several officers already had active and viable job applications in process as part of already-occurring rotations back to their home career services – all of which were stopped and those officers were prevented from moving forward due to their administrative leave status.

126. The Talent Center prepared a binder for CIA leadership titled "Officers on Administrative Leave" that listed each affected officer's name, home Directorate, grade,

background, CIA skill set, accomplishments in non-DEI assignments, and a "potential onward assignment" with a narrative explaining why the officer would be a fit for that position.

127. Despite having identified appropriate onward assignments, Director Ratcliffe declined to reassign Plaintiffs to their home career services and instead determined that all employees who had worked in DIO would be presented with options leading to separation from CIA employment.

**<u>CIA's Decision-Making Process and Alternatives Considered</u>**

128. Between January 20 and January 26, 2025, senior CIA officials, including the Chief Operating Officer and the Associate Director for Talent, worked to provide Director Ratcliffe with options for addressing employees engaged in DEI-related work.

129. These officials framed their recommendation by underscoring that the CIA does not have "DEIA Employees" or employees hired specifically to conduct DEI-related work, and that anyone doing such work was a career officer from elsewhere at CIA working on a rotation or broadening assignment.

130. Senior officials briefed Director Ratcliffe that each affected officer had "critical mission skills" that the officers' home career services could leverage to advance CIA mission needs.

131. CIA leadership presented Director Ratcliffe with the option of reassigning affected officers to their home Directorates, making clear that the CIA would "matriculate these folks [back] into their Directorates."

132. On or about January 24, 2025, the Talent Center asked the Directorates to identify potential onward assignments, and by the end of the weekend of January 25-26, 2025, the Office

of Personnel Resources had provided to the Talent Center a list of retirement-eligible officers as well as biographic write-ups for all affected individuals to make the case for onward assignment.

133. The Associate Director for Talent took this proposal to Director Ratcliffe.

134. Ultimately, Director Ratcliffe had the final authority over all decisions affecting Plaintiffs and other employees who had conducted DEIA-related work.

135. Director Ratcliffe determined that he would not reassign any affected officers and instead instructed CIA leaders to present DIO officers with separation options, including: retirement, if eligible; Voluntary Early Retirement Authority (VERA), if eligible; deferred resignation; immediate resignation; or termination.

136. According to Agency officials, Director Ratcliffe made it clear that the Agency must "abide by the Executive Order" and decided that affected officers would remain on administrative leave and that those who had worked for DIO would be presented with options leading to their separation.

137. Thereafter, on or about February 10, 2025, Plaintiffs received a "benefits package" in the mail from the Agency which contained a draft of their personnel SF-50 action forms, information about the Deferred Resignation Program (DRP) and the Voluntary Early Retirement Authority (VERA), as well as other materials. This packet included an Unclassified FAQ document. The FAQ stated that DEIA content had been removed from Agency websites, that employee resource groups had been disbanded, that supporting DEIA would no longer be considered in any Agency personnel processes (including promotion), and that any intentional acts supporting DEIA would be reported to the Inspector General.

**<u>Director Ratcliffe's February 18, 2025, Termination Decision</u>**

138. On February 18, 2025, Director Ratcliffe issued a memorandum titled "Decision to Terminate the Employment of Employees in the Former Diversity and Inclusion Office."

139. The February 18, 2025, memorandum stated: "To best effectuate the President's direction in [Executive Order 14151] as well as follow-on memoranda from the Acting Director of OPM, I have determined that it is necessary or advisable in the interests of the United States to terminate the employment of all of the employees of the former DIO pursuant to [Section 104A(e)(1) of the National Security Act of 1947] and consistent with [Agency Regulation on Termination of Employment]."

140. Director Ratcliffe invoked his authority under Section 104A(e)(1) of the National Security Act of 1947, 50 U.S.C. § 3036(e)(1), to terminate employees when, in his discretion, he deems it "necessary or advisable in the interests of the United States."

141. In a sworn statement, Director Ratcliffe stated that he understood Executive Order 14151 and OPM memoranda "in combination, effectively prescribed terminating the employment of these employees."

142. Director Ratcliffe further stated that he "determined that in order to best effectuate the directives in [Executive Order 14151] and the 24 January 2025 OPM Memorandum with respect to CIA, I would exercise my authority under Section 104A(e)(1) of the National Security Act."

143. The February 18, 2025, memorandum directed that each affected employee be notified of the termination decision at separate in-person meetings on February 18, 2025.

144. The memorandum provided affected employees with the option to participate in the CIA's implementation of the Deferred Resignation Program (DRP), retire, if eligible, or resign, with a deadline of 5:00 p.m. on February 19, 2025, to make an election.

145. The memorandum stated that employees who did not elect to participate in the DRP or who declined to make any election by the deadline would remain on administrative leave through May 19, 2025, after which their employment would cease effective May 20, 2025.

146. On February 19, 2025, OPR informed affected employees that the election deadline had been paused due to a temporary stay imposed by a federal court.

**Presentation of Separation Options to Plaintiffs**

147. On or about February 14, 2025, many of the Plaintiffs received phone calls from Agency HR officers instructing them to attend in-person meetings on February 18, 2025, to discuss their benefits and options. Other Plaintiffs received phone calls from Agency HR officers reiterating their option to take the DRP or retire, although they were not yet required to attend meetings and HR could not answer any questions.

148. On February 18, 2025, many Plaintiffs attended in-person meetings, during which they were presented with an election sheet offering options for immediate resignation, deferred resignation through the DRP, or termination. No mention was made of onward assignments with the Agency. For those Plaintiffs who were not able to attend in-person meetings, the Agency sent emails to their personal email address(es) which contained similar information.

149. During these meetings, those Plaintiffs who were able to attend in person were met by security representatives, HR representatives, and benefits specialists to discuss separation options. Many Plaintiffs were told that they had to make an immediate decision; regarding their employment status and were not permitted to have legal counsel present during these meetings those Plaintiffs who received the separations option document by email were advised to make a selection by 5:00pm on 19 February 2025.

150. Plaintiffs requested guidance about the status of their security clearances, specific ethics requirements in writing, and options for appeals, but did not receive additional clarity on these subjects.

151. The CIA presented these separation options to Plaintiffs in response to the Agency's implementation of Executive Order 14151. Notably, although the Plaintiffs were notified on February 14, 2025, of the requirement to attend these meetings on February 18, 2025, Director Ratcliffe did not issue his memorandum titled "Decision to Terminate the Employment of Employees in the Former Diversity and Inclusion Office" citing his authorities under the National Security Act, until 18 February 2025.

152. On March 18, 2025, the CIA again presented the same Plaintiffs with updated separation election forms offering the same options: deferred resignation, immediate resignation, or termination, with a deadline of 5:00 p.m. EST on March 31, 2025. Those Plaintiffs who were not presented with separation directives were told of their option to take the DRP, but otherwise, to this date, have never been instructed of any potential outcomes or end-date to their administrative leave.

**Disparate Treatment and Protected Activities**

153. The CIA did not place all officers engaged in DEIA-related work on administrative leave or present all such officers with separation options. For example, certain officers who performed DEIA-related activities from non-DIO positions were not placed on administrative leave, including officers who had recently accepted and started positions outside of DIO; or those officers who held these positions previously, or those who otherwise led Agency-wide diversity-focused resource groups. These officers continued to be employed by the Agency.

154. Officers working in DIO's Accessibility Office were not placed on administrative leave; instead, the Accessibility Office was reorganized under the Chief Operating Officer, and those officers continued working to provide accessibility resources and reasonable accommodations.

155. Officers who had worked in other Agency components on DEIA-related matters, including certain officers in the Talent Acquisition Office who are Plaintiffs in this lawsuit, as well as officers in various Directorates, were placed on administrative leave but were not presented with separation options and have remained on indefinite administrative leave. Therefore, the Agency is demonstrating disparate treatment even within the group of officers placed on administrative leave.

156. According to Agency officials, CIA leadership made the determination that Executive Order 14151 and OPM guidance were worded in such a way as to clearly apply to DIO officers, and that the CIA had more flexibility regarding other officers, even if officers not then working directly for DIO also engaged in DEIA activities. However, the flexibility has resulted in disparate treatment, with some non-DIO officers being placed on administrative leave, while others were permitted to remain at work. Although the Agency continued to assert that Plaintiffs' administrative leave status was neither disciplinary in nature nor due to security matters, their access to Agency facilities was immediately restricted as of January 23, 2025, requiring full escort for any necessary administrative visits (as is done for uncleared visitors) despite the fact that all of the officers remain CIA employees and despite the fact that these officers continue to be beholden to all reporting requirements related to holding their clearances. These actions similarly are indicative of constructive termination, disparate treatment, and a hostile work environment.

157. Prior to being placed on administrative leave and presented with separation options, Plaintiffs were engaged in work in furtherance and protection of federal civil rights laws, including Title VII of the Civil Rights Act of 1964, ADEA, and the Rehabilitation Act of 1973.

158. Plaintiffs' DEIA-related work involved opposing discriminatory workplace practices and supporting the hiring, retention, and advancement of members of protected classes under federal civil rights laws.

159. Plaintiffs understood their duties to include advancing EEO and supporting Agency compliance with Title VII, the Age Discrimination in Employment Act, and the Rehabilitation Act.

160. Executive Order 14151 and implementing guidance characterized DEI programs as "illegal and immoral discrimination" and stated that such programs "divided Americans by race, wasted taxpayer dollars, and resulted in shameful discrimination."

161. The actions taken against Plaintiffs were motivated, in whole or in part, by their engagement in work that the CIA and OPM now characterize as unlawful, despite Plaintiffs' understanding that such work was required by federal law and Agency policy.

**Ongoing Harm to Plaintiffs**[9]

162. As of the filing of this Complaint, Plaintiffs have been subjected to adverse employment actions, including placement on involuntary paid administrative leave for more than 630 days and counting, denial of onward assignments, as well as threats of termination, constructive termination, and/or termination of their CIA employment.

[9] While this section captures broadly the harm Plaintiffs have been subjected to from the Agency's unwarranted and unlawful actions, each Plaintiff has additional individualized harms. However, as noted in footnote 2, an internal Agency pre-publication review process has not completed. Plaintiffs intend to file an amendment to include this additional information once the internal Agency process is complete.

163. While on administrative leave, Plaintiffs have been denied the opportunity to perform meaningful work, have been barred from CIA facilities, and have had their access to Agency systems and information suspended.

164. While on administrative leave, Plaintiffs have been denied the opportunity to compete for onward assignments and promotions within their home career services.

165. Plaintiffs have suffered professional harm, including damage to their reputations, loss of career development opportunities and training, and interruption of their career progression.

166. As a result of Defendants' unlawful actions, Plaintiffs have suffered economic loss, as well as emotional distress, humiliation, and mental anguish.

**<u>Individual Harms</u>**

167. Each Plaintiff has also suffered individualized harms:

a. JANE DOE 1 ([redacted])

b. JANE DOE 2 ([redacted])

c. JANE DOE 3 ([redacted])

d. JANE DOE 4 ([redacted])

e. JANE DOE 5 ([redacted])

f. JANE DOE 6 ([redacted])

g. JANE DOE 7 ([redacted])

h. JANE DOE 8 ([redacted])

i. JANE DOE 9 ([redacted])

j. JANE DOE 10 ([redacted])

k. JANE DOE 11 ([redacted])

l. JOHN DOE 1 ([redacted])

m. JOHN DOE 2 ([redacted])

n. JOHN DOE 3 ([redacted])

o. JOHN DOE 4 ([redacted])

p. JOHN DOE 5 ([redacted])

q. JOHN DOE 6 ([redacted])

**COUNT I**
***VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964***
***AND THE REHABILITATION ACT***
***(RETALIATION)***

168. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if asserted herein.

169. Title VII prohibits federal agencies from retaliating against employees who oppose unlawful employment practices or who participate in proceedings under Title VII. 42 U.S.C. § 2000e-16(a).

170. The Rehabilitation Act prohibits federal agencies from retaliating against employees who oppose unlawful employment practices or who participate in proceedings under the Rehabilitation Act. *See* 29 U.S.C. § 701, *et seq*.; 29 U.S.C. § 794(a)(2) (incorporating Title VII's prohibition on retaliation).

171. Plaintiffs engaged in protected activity by performing work designed to oppose discriminatory employment practices and to advance EEO in accordance with Title VII, the Rehabilitation Act, the ADEA, and other federal civil rights laws.

172. Plaintiffs' DEIA-related work included supporting recruitment and retention of members of protected classes, developing inclusive policies, and ensuring Agency compliance with federal EEO requirements.

173. Defendants were aware of Plaintiffs' protected activities because such activities were the basis for Plaintiffs' job assignments and responsibilities and were the sole basis for the employment actions at issue.

174. The CIA subjected Plaintiffs to adverse employment actions, including placement on administrative leave, denial of onward assignment, threatened termination, termination, and/or constructive termination.

175. Defendants collectively created conditions around Plaintiffs' administrative leave that were so unpleasant and difficult that a reasonable person in each Plaintiff's position would have felt compelled to leave the Agency. Defendants deliberately made Plaintiffs' working conditions so intolerable in order to drive Plaintiffs to quit their jobs, which constitutes a constructive discharge of each Plaintiff.

176. Defendants' adverse actions were causally connected to Plaintiffs' protected activities, as evidenced by the fact that Plaintiffs were selected for adverse treatment based specifically on their engagement in DEIA work and temporary assignments to the DIO and DEIA positions.

177. Executive Order 14151 and implementing guidance expressly targeted employees engaged in DEI work, characterizing such work as unlawful and wasteful, thereby directly retaliating against employees who had opposed discriminatory practices.

178. The temporal proximity between Plaintiffs' protected activities and the adverse actions, combined with the Agency's stated rationale for the actions, establishes a causal connection.

179. Plaintiffs have exhausted their administrative remedies or are excused from doing so. 42 USCS § 2000e-16.

180. As a direct and proximate result of Defendants' unlawful retaliation, Plaintiffs have suffered and continue to suffer damages. As a direct and proximate result of the retaliatory acts and Defendants' conduct, Plaintiffs have suffered and continue to suffer emotional and mental distress, anguish, humiliation, pain, anxiety, in addition to economic loss associated with loss of employment and denial of future employment opportunities and any associated retirement benefits.

**COUNT II**
***VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964***
***(DISPARATE TREATMENT AND/OR IMPACT DISCRIMINATION BASED ON RACE/ NATIONAL ORIGIN/RELIGION)***

181. Plaintiffs Jane Doe 2, 4-9 – John Doe 2 and 4 who allege race, national origin, and/or religion reallege and incorporate by reference all preceding paragraphs as if asserted herein.

182. Title VII of the Civil Rights Act of 1964 prohibits federal agencies from discriminating against employees on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-16(a).

183. At all relevant times, Plaintiffs were federal employees protected by Title VII.

184. The CIA is a federal agency subject to Title VII's prohibition on employment discrimination.

185. Plaintiffs Jane Doe 2, 4-9 – John Doe 2 and 4 include individuals who are Jewish, Asian, Native American, and African American.

186. The CIA subjected Plaintiffs Jane Doe 2, 4-9 – John Doe 2 and 4 to adverse employment actions, including placement on involuntary administrative leave, denial of onward assignments, and termination or constructive termination from federal employment.

187. The CIA's actions were motivated, in whole or in part, by Plaintiffs' Jane Doe 2, 4-9 – John Doe 2 and 4 race, national origin, and/or religion.

188. The CIA treated Plaintiffs Jane Doe 2, 4-9 – John Doe 2 and 4 differently from similarly situated employees of other races who were not subjected to the same adverse employment actions.

189. The decision to place Plaintiffs Jane Doe 2, 4-9 – John Doe 2 and 4 on administrative leave and to present them with separation options was based on their work in DEIA, which the Agency and Executive Order 14151 associated with programs benefiting racial minorities and other protected groups.

190. The characterization of DEIA programs as "illegal and immoral discrimination" and the decision to terminate employees engaged in such work reflects discriminatory animus against employees, including Plaintiffs Jane Doe 2, 4-9 – John Doe 2 and 4, who are themselves members of minority groups related to race, national origin, and/or religion.

191. Plaintiffs Jane Doe 2, 4-9 – John Doe 2 and 4 have exhausted their administrative remedies or are excused from doing so because the CIA has not taken final action on their claims and more than 180 days have passed since the filing of administrative complaints, or because exhaustion would be futile. 42 U.S.C. § 2000e-16.

192. As a direct and proximate result of the CIA's unlawful discrimination, Plaintiffs Jane Doe 2, 4-9 – John Doe 2 and 4 have suffered and continue to suffer damages, including lost wages and benefits, emotional distress, humiliation, and damage to their professional reputations.

**COUNT III**
***VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964***
***(DISPARATE TREATMENT AND/OR IMPACT DISCRIMINATION BASED ON SEX)***

193. Plaintiffs Jane Doe 1 – Jane Doe 11 reallege and incorporate by reference all preceding paragraphs as if asserted herein.

194. Title VII prohibits federal agencies from discriminating against employees on the basis of sex. 42 U.S.C. § 2000e-16(a).

195. Plaintiffs Jane Does 1–11 are individuals who are female.

196. The CIA subjected Plaintiffs Jane Does 1–11 to adverse employment actions based, in whole or in part, on their sex.

197. The decision to terminate employees engaged in DEIA work was motivated by discriminatory animus against programs that benefit women and address sex-based disparities in federal employment.

198. The CIA treated Plaintiffs Jane Does 1–11 differently from similarly situated male employees who were not subjected to the same adverse employment actions.

199. Plaintiffs Jane Does 1–11 have exhausted their administrative remedies or are excused from doing so. 42 U.S.C. § 2000e-16.

200. As a direct and proximate result of the CIA's unlawful sex discrimination, Plaintiffs Jane Does 1–11 have suffered and continue to suffer damages.

**COUNT IV**
***ADEA VIOLATION***
***(Disparate Treatment and/or Impact)***

201. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if asserted herein.

202. Plaintiffs Jane Does 1-3, 5-10 and John Does 1 – 3, 5, 6 are all over forty and are members of the protected class under ADEA.

203. ADEA protects federal employees against employment practices that are facially neutral in their treatment of older workers if their impact, in fact, falls more harshly on older employees and the decision cannot be justified by business necessity.

204. Plaintiffs suffered an adverse employment action, including denial of onward assignments, placement on administrative leave, and termination, including constructive termination and threatened terminations.

205. Defendants' antecedent decisions leading up to the employment actions at issue have caused statistical disparities harming older workers, including Plaintiffs, in favor of substantially younger workers.

206. The specific actions that caused disparate impact include, but are not limited to, failure to give Plaintiffs onward assignments, placement of Plaintiffs on administrative leave, and offering Plaintiffs courses of action that only led to the Plaintiffs' departure from employment with the Agency.

207. As a direct and proximate result of the discriminatory acts and Defendants' conduct, Plaintiffs have suffered and continue to suffer emotional and mental distress, anguish, humiliation, pain, anxiety, in addition to economic loss associated with loss of their employment and denial of future employment opportunities.

208. Defendants knew that their conduct was prohibited by the ADEA and showed a reckless disregard for whether it was prohibited.

209. Plaintiffs are entitled to all remedies under ADEA including reinstatement, backpay, and liquidated damages.\

## COUNT V
## *VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 701, et seq.*

210. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if asserted herein.

211. The Administrative Procedure Act authorizes judicial review of final agency action. Director Ratcliffe's adverse employment decisions, which include termination of Plaintiffs' employment, constitutes final agency action subject to review under the APA. 5 U.S.C. §§ 701, et seq.

212. The Administrative Procedure Act provides that a reviewing court shall hold unlawful and set aside agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right; short of statutory right; without observance of legally required procedure; unsupported by substantial evidence reviewed on the record of an agency hearing provided by statute; or unwarranted by the facts to the extent that the facts are subject to trial *de novo* by the reviewing court. *See* 5 U.S.C. § 706(2).

### Excess of Statutory Authority

213. Section 104A(e)(1) of the National Security Act of 1947 authorizes the Director of the CIA to terminate the employment of any CIA officer or employee "whenever he shall deem such termination necessary or advisable in the interests of the United States." This termination authority requires an individualized determination that termination is "necessary or advisable in the interests of the United States." Section 104A(e)(1)

214. Director Ratcliffe made no individualized findings regarding any Plaintiff's performance, conduct, security risk, or mission necessity.

215. Instead, Director Ratcliffe applied a categorical rule: all employees who worked in DIO as of January 20, 2025, would be terminated, regardless of their qualifications, career history, or the availability of suitable alternative positions.

216. By failing to make individualized determinations and by categorically terminating all DIO employees without consideration of alternatives, Director Ratcliffe acted in excess of his statutory authority.

217. Director Ratcliffe's invocation of this authority to implement a mass termination of employees based solely on their prior work assignments, rather than individual assessments of whether termination was necessary or advisable for each employee, exceeded his statutory authority.

218. Director Ratcliffe's explanation that termination was "necessary or advisable in the interests of the United States" is conclusory and provides no rational connection to the facts.

219. The Director's decision was further in excess of authority because it was not made in the interests of the United States, but rather to comply with a presidential directive that itself was not authorized by statute and that conflicts with federal civil service protections and federal law.

220. In fact, Defendants' employment actions and decision to terminate Plaintiffs' employment was not in the interests of the United States, as it constituted a loss of employees with institutional knowledge and specialized skills critical to the CIA's mission and a loss of the CIA's investment in those employees' training and education.

**Without Observance of Legally Required Procedure**

221. Pursuant to the National Security Act, the CIA's Termination Regulation establishes procedures that must be followed when the CIA contemplates terminating an Agency employee's employment.

222. The CIA did not terminate Plaintiffs' employment in accordance with the CIA's Termination Regulation or other applicable procedures.

223. Instead, Director Ratcliffe invoked his authority under the National Security Act to directly terminate Plaintiffs' employment without affording them the procedural protections to which they were entitled.

224. The CIA failed to provide Plaintiffs with adequate notice of the basis for their separation, an opportunity to respond, or an explanation of their rights.

225. The CIA failed to consider Plaintiffs for reassignment to positions for which they were qualified and which the Agency had identified as suitable.

226. Defendants have placed Plaintiffs on administrative leave, denied onward assignments, threatened termination, terminated, constructively terminated and/or planned to terminate Plaintiffs without following any legal procedure required by Agency regulations and without any evidentiary record, as could be presented by Plaintiffs in their defense at a CIA PEB, for example. As such, Plaintiffs will not receive and have not received a hearing, even before the MSPB, nor will they receive rights of appeal. Defendants, therefore, have acted without observance of legally required procedure.

227. By failing to observe procedures required by law, Defendants violated the APA, and Plaintiffs have been unlawfully removed from federal employment without due process.

**Arbitrary and Capricious**

228. Director Ratcliffe's termination decision was arbitrary and capricious because he relied on factors Congress did not intend him to consider, entirely failed to consider important aspects of the problem, and reached a decision that is implausible and unsupported by a rational connection between the facts found and the choice made.

229. Plaintiffs' suspension shortly after the issuance of the Executive Order, only on the basis of their temporary assignments to alleged DEIA roles, and their anticipated firings, even though E.O. 14151 does not demand their termination, is the definition of arbitrary, capricious, and abusive agency action.

230. As a result of this arbitrary and capricious agency action, Plaintiffs have been unlawfully removed from federal employment and have suffered and continue to suffer irreparable harm.

**Unsupported by Record Evidence and Error of Judgment**

231. Director Ratcliffe's reliance on Executive Order 14151 and OPM guidance as mandating termination was contrary to the evidence and to law, as neither the Executive Order nor OPM guidance required termination where alternative placements were available.

232. In placing Plaintiffs on administrative leave, denying onward assignment, threatening termination, constructively terminating, and/or terminating Plaintiffs' employment, Director Ratcliffe failed to consider the obvious alternative of reassigning Plaintiffs to their home career services, despite the CIA having identified specific onward positions for which Plaintiffs were well-qualified.

233. The CIA's own officials prepared detailed materials demonstrating that each Plaintiff possessed "critical mission skills" and identifying potential onward assignments, yet Director Ratcliffe did not articulate any reasoned basis for rejecting this alternative.

234. Director Ratcliffe failed to examine relevant data concerning Plaintiffs' qualifications, skills, and the availability of suitable positions within their home career services.

235. The decision runs counter to the evidence before the Agency, which showed that Plaintiffs were highly qualified career officers in whom the CIA invested considerable resources who have valuable skills needed for CIA mission requirements.

236. The CIA treated similarly situated employees differently without explanation, placing some officers on administrative leave without separation options while presenting Plaintiffs with mandatory separation choices.

237. The decision to terminate Plaintiffs was not based on a consideration of the relevant factors and constituted a clear error of judgment. 5 U.S.C. § 706.

**<u>Constitutional Rights Violated</u>**

238. Defendants placed Plaintiffs on administrative leave, pending termination, and/or terminated Plaintiffs' employment contrary to Plaintiffs' constitutional rights under the First Amendment to free speech, based on Defendants' assumptions about Plaintiffs' DEIA beliefs, which is a *domestic* political issue. This issue is wholly irrelevant to their service in the Agency dedicated to collecting and analyzing *foreign* intelligence and supporting such collection and analysis efforts.

239. Plaintiffs' placement on administrative leave, terminations, and/or pending terminations are also contrary to their Fifth Amendment Due Process rights, including adequate notice and a

record and the opportunities to be heard and to appeal prior to being denied their employment property interest.

240. Because of Defendants' public statements and press attention to the DEIA employment terminations, Plaintiff's administrative leave, denial of onward assignment, pending terminations, constructive terminations, and/or terminations have crippled Plaintiffs' ability to obtain employment within their professions outside the CIA, including with defense and intelligence contractors.

241. It is unprecedented for a group of federal officers to be terminated pursuant to a public statement by the President that their last assignment involved dangerous, demeaning, immoral and illegal activity, undermining of national unity and denying, discrediting and undermining traditional American values, supporting an unlawful, corrosive, and pernicious identity-based spoils system, stigmatizing and demeaning hardworking Americans, resulting in tragic and disastrous consequences on the basis of pernicious discrimination.

242. As a result of Defendants' actions, Plaintiffs have been unlawfully placed on administrative leave, denied onward assignments, threatened with employment termination, constructively terminated, and/or removed from federal employment.

243. There is no remedy other than a judicial remedy for the harm Plaintiffs will suffer and have suffered from being placed on administrative leave, from facing the threat of termination of their employment, and from having their employment terminated.

## COUNT VI
## *FIRST AMENDMENT VIOLATION*

244. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if asserted herein.

245. The First Amendment provides, in pertinent part, that Congress shall make no law abridging the freedom of speech, or the right of the people to petition the Government for redress of grievance, such as the issues raised by DEIA.

246. Plaintiffs' terminations are contrary to their constitutional right under the First Amendment to free speech about their *assumed* beliefs about a *domestic political* issue—the advancement and enforcement of the civil rights laws of the United States among American citizens—while serving in agencies dedicated to foreign intelligence. The Plaintiffs were assigned by the Agency to programs lawfully funded and mandated by Congress specifically to promote DEIA objectives within the Agency.

**COUNT VII**
***FIFTH AMENDMENT VIOLATION***

247. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if asserted herein.

248. The Fifth Amendment provides, in pertinent part, that no person shall be deprived of property without due process of law.

249. Defendants placed Plaintiffs on administrative leave, threatened termination of Plaintiffs' employment, planned to terminate Plaintiffs' employment, constructively terminated Plaintiffs' employment, and/or constructively terminated Plaintiffs' employment, all with insufficient notice, without any of the agency administrative procedures required by law, and without any evidentiary record—no hearing at all, not even before the MSPB—or right of appeal. As such, Defendants' actions are contrary to Plaintiffs' constitutional right to due process before being denied their property interest in their employment.

**COUNT VIII**
***VIOLATION OF THE ADMINSTRATIVE LEAVE ACT***

250. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if asserted herein.

251. The Administrative Leave Act prevents Defendants from placing an employee on administrative leave for more than a total of ten work days unless the Agency determines that an employee must be removed from the workplace while under investigation, or during a notice period, when an authorized agency official determines that the employee's continued presence in the workplace may pose a threat to the employee or others, result in the destruction of evidence relevant to an investigation, result in damage to Government property, or jeopardize legitimate Government interests. *See* 5 U.S.C § 6329a(b)(1).

252. Congress amended the Administrative Leave Act to indicate that an agency's decision to keep an employee on administrative leave for more than ten days is an admission that the employee is subject to a disciplinary action or under investigation for misconduct.

253. Because Congress limited administrative leave for investigative purposes to ten workdays per calendar year and viewed extended periods of paid non-duty status as requiring additional procedural safeguards, it established separate statutory authorities for investigative leave and notice leave. Accordingly, the Act requires that an employee placed on notice leave receive notice of a proposed adverse action and the applicable notice period, which ends on the date the agency make take adverse action.

254. None of the ALA's conditions are pertinent to Plaintiffs' being placed on administrative leave by Defendants because they are believed to have served in DEIA-related assignments.

255. Plaintiffs have involuntarily been on such leave since January 22, 2025, which constitutes an adverse employment action in violation of law.

256. The U.S. government has paid approximately $4,000,000.00 of taxpayer dollars to these Plaintiffs for performing no work whatsoever and squandering their expert capabilities.

257. Plaintiffs suffered harm due to this action, including being denied notice, the opportunity to respond, and the opportunity to perform their duties for more than ten workdays, which in turn impacted their performance reviews, employment benefits, and ability to find suitable employment after termination.

## COUNT IX
## *DECLARATORY JUDGMENT – 28 U.S.C. §§ 2201 AND 2202*

258. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if asserted herein.

259. Plaintiffs are entitled to declaratory relief on the basis of all claims alleged herein. There is a substantial and ongoing controversy between Plaintiffs and Defendants, and a declaration of rights under the Declaratory Judgment Act is necessary and appropriate to establish that Defendants have no authority to remove Plaintiffs without affording them all rights and protections under applicable statutes and regulations.

260. Plaintiffs have suffered adverse harmful effects, including, but not limited to, lost or jeopardized present or future financial and career opportunities and reputational harm. Plaintiffs, therefore, are entitled to be returned to work at the CIA, reinstatement, an award of backpay, and any other available damages.

## COUNT X
## *RELIEF IN NATURE OF MANDAMUS*

261. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if asserted herein.

262. Plaintiffs, in the alternative, are entitled to relief in the nature of mandamus compelling Defendants to return them to offices within the CIA and compelling Defendants to refrain from removing Plaintiffs from federal service without following lawful procedures. Defendants have a legal duty to afford Plaintiffs all protections prescribed by law prior to terminating Plaintiffs from federal service.

263. The provisions of 28 U.S.C. 1361 allow for an independent cause of action in cases seeking relief in the nature of mandamus against federal officers, employees, and agencies in the absence of any other available remedies. To the extent relief is not available under the CSRA, Agency regulations, the APA, common law equity, or any other law to enjoin unlawful government action, mandamus lies here.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Declare that Defendants' actions in placing Plaintiffs on administrative leave and terminating or constructively terminating their employment were arbitrary, capricious, an abuse of discretion, in excess of statutory authority, without observance of procedure required by law, and/or otherwise contrary to law in violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A), (C), (D).

2. Declare that Defendants' actions violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16, and the Rehabilitation Act by retaliating against Plaintiffs for engaging in protected activity. 42 U.S.C. § 2000e-16.

3. Issue a permanent injunction:

   a. Reinstating Plaintiffs to their former positions or to positions of comparable rank, seniority, and pay within the CIA;

b. Prohibiting Defendants from implementing or enforcing any employment decision based on the unlawful actions challenged in this Complaint;

c. Requiring Defendants to expunge from Plaintiffs' personnel records any reference to their placement on administrative leave, termination, or separation pursuant to Executive Order 14151 and Director Ratcliffe's February 18, 2025, memorandum;

d. Requiring Defendants to restore to Plaintiffs all security clearances, building access, and employment privileges held prior to January 22, 2025.

4. Award Plaintiffs compensatory damages for all economic losses, including:

a. Back pay from the date of their constructive termination or separation through the date of reinstatement;

b. Front pay if reinstatement is not feasible;

c. Lost benefits, including retirement contributions, health insurance, and other employment benefits;

d. Compensation for lost promotional opportunities and career advancement.

5. Award Plaintiffs compensatory damages up to the statutory maximum for non-economic losses, including emotional distress, humiliation, mental anguish, pain and suffering, and reputational harm.

6. Award Plaintiffs pre-judgment interest and post-judgment interest as provided by law.

7. Award Plaintiffs their reasonable attorney's fees, expert fees, and costs of suit as authorized by law, including 42 U.S.C. § 2000e-16(b) and 42 U.S.C. § 2000e-5(k).

8. Grant such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: October 16, 2026

Respectfully submitted,

/s/ Kevin E. Byrnes
Kevin E. Byrnes, Esq. (VA Bar # 47623)
Patrick J. Hughes, Esq (VA Bar # 91483)
Deirdre Brou, Esq. (VA Bar # 99874)
Patriots Law Group
of Lyons & Hughes, P.C.
2760 Eisenhower Ave, Suite 250
Alexandria, Virginia 22314
T: (301) 952-9000
F: (240) 699-8108
E: kevinbyrnes@patriotslaw.com
E: patrickhughes@patriotslaw.com
E: DeirdreBrou@patriotslaw.com

*Attorneys for Plaintiffs*